UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JASON CLOVER, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CAMP PENDLETON & QUANTICO HOUSING LLC, et al.,<br><br>Defendants. | Case No.: 20cv567-LAB (WVG)<br><br>**ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT [Dkt. 79]** |

Plaintiffs Jason and Valerie Clover, along with their minor children, J.C. and P.C., by and through their guardian ad litem Roger Holmes (collectively, "Plaintiffs"), are former residents of military housing located on base at Marine Corps Base Camp Pendleton ("Camp Pendleton"). They bring this action against Defendants Camp Pendleton & Quantico Housing LLC ("CPQH") and LPC Pendleton Quantico Property Management, LP ("LPC") (collectively, "Defendants"), for injuries stemming from Defendants' alleged failure to properly maintain or repair Plaintiffs' residence, resulting in moisture, water intrusion, and mold conditions in their residence.

On February 7, 2023, Defendants filed a Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment. (Dkt. 79). Plaintiffs oppose Defendants' motion. (Dkt. 89). The Court has read all materials in support of and

in opposition to the Motion, and rules as follows.

## I. UNDISPUTED MATERIAL FACTS[1]

Under the Military Housing Privatization Initiative ("MHPI"), branches of the Armed Forces can establish public-private ventures with a private entity to operate and manage their military housing on government land. Pursuant to the MHPI, the United States Navy ("Navy") entered into an Operating Agreement with Hunt Lincoln Clark Family Communities, LLC, to form Defendant CPQH, to aid and assist the Navy with its military housing operations, including at Camp Pendleton.[2] Under the terms of the Operating Agreement, CPQH has primary responsibility for managing the military housing it owns. Under its terms, the United States directs the cash flow for the operations phases of the project, and retains budgetary approval and oversight, as well as direct budgeting involvement.

On or about August 1, 2001, the Navy entered into a Ground Lease with Defendant CPQH for the South Mesa I neighborhood, including the property located at 296 Tierra Blanca, Oceanside, California ("Property"). The Navy retained the right to inspect the Camp Pendleton housing at any time on environmental issues. CPQH was directed by the Operating Agreement to enter a Property Management Agreement ("PMA") with Defendant LPC relating to the South Mesa I community and the Property. The PMA contains a Management Plan and Mold Management Plan ("the Plans"). The Plans developed a strategy for addressing military housing conditions and maintenance requests, and specifically mold and moisture conditions, in the housing, and outline a general plan, and give certain

---

[1] Pursuant to Federal Rule of Evidence 201, Defendants' request for judicial notice as to Exhibits A-1, B-1, C-1, and D-1 is **GRANTED**. (Dkt. 79-2); *see Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012)

[2] Both Defendants CPQH and LPC are affiliates of a company called Liberty Military Housing, formerly known as Lincoln Military Housing ("Lincoln"). (Dkt. 98 at 2).

directions and factors to evaluate, based on what is discovered on site, for response to tenant complaints and service orders, including specifically those as to mold and moisture; the Navy set the parameters for the Plans. CPQH has exclusive management and control of the property management business of the company and has full authority to take all actions necessary or appropriate to pursue the business and carry out the company's purpose of the Company.

Plaintiff Jason Clover, a United States Marine, along with his family, were residents on the Property at Camp Pendleton, from on or about June 2014 until on or about June 2019. They filed their initial complaint in San Diego Superior Court on November 22, 2019, asserting ten state law causes of action against Defendants. (Dkt. 1-4). They claim that while living at the Property, they became sick from water intrusion and mold issues and that Defendants didn't adequately address these issues during the duration of Plaintiffs' tenancy. Defendants subsequently removed the case to federal court.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate under Rule 56(a) where the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* at 324. The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the Court draws all reasonable factual inferences in

favor of the non-movant. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* (citation omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 242. The Court does not make credibility determinations or weigh conflicting evidence. *Id.* at 255. Rather, the Court determines whether the record "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### III. ANALYSIS

#### A. Federal Enclave Doctrine

Defendants first argue that the Court should grant summary judgment on certain of Plaintiffs' state law claims under the federal enclave doctrine. This doctrine originates from Article I, Section 8, Clause 17, of the United States Constitution, which "provides that Congress shall have the power to exercise exclusive legislation over all places purchased by the consent of the legislature of the state in which the same shall be." *Stiefel v. Bechtel Corp.*, 497 F. Supp. 2d 1138, 1147 (S.D. Cal. 2007). It permits, with some exceptions, "the continuance of those state laws existing at the time of surrender of sovereignty." *Id.* "Only state laws in effect at the time of cession or transfer of jurisdiction, however, can continue in operation. Laws subsequently enacted by the state are inapplicable in the federal enclave unless they come within a reservation of jurisdiction or are adopted by Congress." *Id.* (citation omitted).

Defendants assert, and Plaintiffs don't dispute, that Camp Pendleton is a federal enclave, and that the federal government purchased that land from the

State of California "no later than December 31, 1942."³ *Id*. at 1147; *accord Cooper v. S. Cal. Edison Co.*, 170 Fed. Appx. 496, 497 (9th Cir. 2006) (citing *United States v. Fallbrook Pub. Util. Dist.*, 110 F. Supp. 767, 771 (S.D. Cal. 1953)). The parties instead dispute whether Camp Pendleton's federal enclave status even applies here, and whether it bars certain of Plaintiffs' state law claims that were enacted after the creation of the federal enclave in 1942.

Specifically, Plaintiffs argue that, in passing the MHPI, Congress shifted the responsibilities associated with military housing from military branches, such as the Navy, to various private entities, such as Defendants. (Dkt. 89 at 6–7). They explain that the Navy entered into an Operating Agreement with Lincoln to form CPQH, with Lincoln being the "Managing Member" of CPQH, and that such an agreement delegated all management responsibilities and control to Lincoln—not the Navy—thereby rendering Defendants "completely, entirely, and independently responsibly for the management of military housing at Camp Pendleton." (*Id*. at 8–9). As such, Plaintiffs argue the "terms of the contracts between the Navy and Defendants . . . are an extension of [ ] oversight authority validly conferred by statute to the Department of Defense and clearly provide that state law applies." (*Id*. at 11).

Notwithstanding Plaintiffs' failure to cite any case law in support of this position, their argument fails. In essence, Plaintiffs argue that certain provisions invoking California state law in Defendants' contracts with the Navy override the application of the federal enclave doctrine because Congress, through the MHPI, empowered the Department of Defense, and by extension the Navy, to manage

---

³ Pursuant to Federal Rule of Evidence 201, the Court takes judicial notice on its own of Camp Pendleton's status as a federal enclave because it "1) is generally known within the trial court's territorial jurisdiction," and it "(2) can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b), (c)(1).

1  and control military housing. But as Defendants point out, "[n]either the language
2  of the [MHPI] nor its legislative history indicate that Congress intended to cede
3  authority in federal enclaves back to the states." (Dkt. 93 at 4). Indeed, Plaintiffs
4  don't point to any provision of the MHPI that would indicate otherwise. As the
5  Supreme Court held in *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988),
6  "the activities of federal installations are shielded by the Supremacy Clause from
7  direct state regulation unless Congress provides 'clear and unambiguous'
8  authorization for such regulation." This shield likewise extends to "a federally
9  owned facility performing a federal function . . . even though the federal function is
10 carried out by a private contractor." *Id.* at 181. That is squarely the case here.
11 Absent clear intent on the part of Congress to surrender the federal government's
12 sovereignty over Camp Pendleton, the Court rejects Plaintiffs' argument. *See*
13 *Compton v. Oasis Sys., LLC*, 549 F. Supp. 3d 1173, 1183 (S.D. Cal. 2021)
14 ("Consequently, because the federal enclave doctrine applies, and there being no
15 indication that Congress provided clear and ambiguous authorization for California
16 to regulate activities on the Acoustic, the Court finds that Plaintiff's state law
17 claims . . . are barred."); *Mersnick v. USProtect Corp.*, No. C-06-03993 RMW,
18 2006 WL 3734396, at *6 (N.D. Cal. Dec. 18, 2006) ("Plaintiff's argument that a
19 contract between a private party and the federal government is sufficient to bar the
20 application of the Federal Enclave Doctrine is unpersuasive.").

21              **i. Review of Plaintiffs' Claims**

22      Because the federal enclave doctrine applies here, the Court must assess
23 whether any of Plaintiffs' state law claims were recognized after the acquisition of
24 Camp Pendleton in 1942. Defendants argue that the barred claims include claims
25 for negligent misrepresentation; negligent infliction of emotional distress; breach
26 of implied warranty of habitability; breach of implied covenant of quiet use and
27 enjoyment; rent abatement; and premises liability. Plaintiffs challenge Defendants'
28 contentions as to their negligent misrepresentation and breach of implied covenant

of quiet use and enjoyment claims, arguing that these claims pre-date the creation of the federal enclave in 1942. (Dkt. 89 at 13–15).

As to negligent misrepresentation, Plaintiffs argue that "the California legislature generated the cause of action . . . with passage of California Civil Code Section 1710," which was enacted in 1872. (*Id*. at 13–14). Defendants appear to concede that section 1710 was first enacted in 1872, but argue that it wasn't until 1954 that the California Supreme Court officially held that scienter is not a required element of this claim, contrary to previous interpretations of the statute. (Dkt. 93 at 7 (citing *Gagne v. Bertran*, 43 Cal. 2d 481, 487 n.4 (1954)). However, Defendants do not cite, and the Court has not found, any authority suggesting that the challenged statute must have been in final form when enacted, or that subsequent alterations to the elements of a claim are not to be considered in determining whether the claim pre-dates or post-dates the creation of the federal enclave. To be sure, it is unclear whether a claim can ever be in its final form, as courts routinely refine their interpretations of statutes and regulations promulgated by the legislature. The Court **DENIES** Defendants' motion for summary judgment as to Plaintiffs' negligent misrepresentation claim.

As to Plaintiffs' claim for breach of the implied covenant of quiet use and enjoyment, Defendants again argue that this claim "did not come into its current form until it was discussed in conjunction with the breach of the implied warranty of habitability in 2001 where they were discussed as 'overlapping.'" (Dkt. 79-1 at 12). Although Defendants acknowledge that a claim for "implied covenant" of "quiet possession" of the leased premises was in effect in 1942 under Civil Code section 1927, they argue that the nature of that claim was more like an action to quiet title for a leasehold, which is not what Plaintiffs are claiming here. (Dkt. 79-1 at 12 ("Here, Plaintiffs do not contend their breach of the implied covenant of quiet use and enjoyment as a violation of Civil Code section 1927—there is no suggestion of any person trying to lawfully claim the property away from them.")). But

Defendants' assertions are incorrect. As Plaintiffs point out, section 1927, originally enacted in 1872, "not only applied to cases involving evictions or invasions, but also [to] disturbances of possession." That's precisely what Plaintiffs allege here. (*Id*. at 14). California case law is clear that a claim for breach of the covenant of quiet enjoyment of possession, whether express or implied, existed well before 1942. *See McDowell v. Hyman*, 117 Cal. 67, 70–71 (1897) ("The principal covenant on the part of a landlord, which, if not expressed, is implied, is that his tenant shall have the quiet enjoyment and possession of the premises during the continuance of the term. 'This covenant, whether expressed or implied, means that the tenant shall not be evicted or disturbed by the lessor' . . .") (citation omitted); *Agoure v. Lewis*, 15 Cal. App. 71, 76 (Cal. Ct. App. 1910) ("In order to constitute a breach of this [implied covenant of quiet enjoyment of possession,] it is held that there must be an eviction of the tenant, actual or constructive. It is not held, however, that in order to constitute an eviction there must be an actual ejectment or ouster of the tenant from the whole premises. It is enough that his possession has been disturbed to his damage by a person entitled to use or possess the property. . . . [A]ny interference with the possession of the tenant by any such person establishes a cause of action in favor of the tenant against the landlord."); *La France v. Kashishian*, 204 Cal. 643, 645 (1928) ("[A] lease which is silent as to guaranty of ownership of the leased premises by the lessor, nevertheless carries an implied warranty of the title in him, and consequent quiet possession in the lessee during the term specified in the lease."); *see also Black v. Knight*, 176 Cal. 722, 725 (1917) ("It is elementary that the covenant for quiet enjoyment goes only to the possession, and that to constitute a violation thereof, . . . 'there must be some act of molestation, affecting, to his prejudice, the possession of the covenantee.' . . . [A]ny wrongful act of the landlord which directly results in depriving the tenant of the full beneficial enjoyment of the premises is an eviction.") (citation omitted). Defendants' motion for summary judgment as to this claim is

**DENIED**.

Plaintiffs next challenge Defendants' assertion that *Stearman* damages are unavailable in this case because *Stearman v. Centex Homes*, 78 Cal. App. 4th 611 (2000), the case from which this category of damages derives, post-dates 1942. (Dkt. 79-1 at 13; Dkt. 89 at 16). As both parties acknowledge, *Stearman* damages are not an independent claim, and Defendants provide no authority for their proposition that the federal enclave doctrine bars categories of damages rather than simply post-dated state law claims. Defendants' motion for summary judgment as to *Stearman* damages is **DENIED**.

Finally, with respect to their claims for breach of the implied warranty of habitability and rent abatement, Plaintiffs argue that these claims were specifically contracted for in the operative lease agreement entered into by the parties. (Dkt. 89 at 15). They make no showing, however, that these claims existed in California prior to 1942. Instead, they urge that the California Civil Code should apply because their lease agreement calls for it. But for the reasons explained above, the federal enclave doctrine bars the application of state law to claims not in existence at the time of the federal enclave's creation. Plaintiffs' lease agreement neither trumps nor supersedes established federal law. The Court **GRANTS** summary judgment as to those claims.

Likewise, because Plaintiffs offer no argument or authority opposing Defendants' assertions that their negligent infliction of emotional distress and premises liability claims post-date the creation of Camp Pendleton as a federal enclave, summary judgment is **GRANTED** as to those claims.

### B. Supremacy Clause

Defendants next advance a theory that the Supremacy Clause bars Plaintiffs' state law causes of action. Citing *Goodyear*, Defendants argue that government contractors operating a federally owned facility are shielded from liability under state law. *Goodyear Atomic Corp.*, 486 U.S. at 184. It is unclear to the Court

whether and the extent to which this argument differs from their argument concerning the federal enclave doctrine. Nor do Defendants identify any additional state law claims that would fail under this theory beyond those already covered by the federal enclave doctrine. Because this argument is subsumed in the Court's previous analysis of the federal enclave doctrine, *supra* Section III.A, the Court rejects it for the same reasons.

### C. Choice of Law

Defendants next argue that a choice-of-law provision in the parties' lease agreement provides that the parties' contractual relationship is to be governed exclusively by federal substantive law, with certain exceptions. (Dkt. 79-1 at 13–14). That provision states as follows:

> **36. <u>Choice of Law</u>**. Owner and Resident agree that this Lease and the contractual relationship between the parties shall be construed exclusively in accordance with, and shall be exclusively governed by, federal substantive law, except that the following state law shall apply: California Civil Code, Sections 1940–1954.1 (Leasing Land and Dwellings), and Sections 1980–1991 (Disposition of Personal Property Remaining on Premises at Termination of Tenancy), California Code of Civil Procedure Sections 1159–1179a (Summary Proceedings for Obtaining Possession of Real Property in Certain Cases), and California state common law interpreting these sections.

(Dkt. 89-1, Ex. 2, ¶ 36). Defendants contend that California Civil Code sections 1940–1954.1, which relate to leasing land and dwellings, are the only exceptions applicable to this case, but "could only have applied here had Plaintiffs brought a breach of lease claim against Defendants but they did not." (Dkt. 79-1 at 14). Defendants offer no authority for this position, and it's unclear why Defendants believe this to be a requirement of the Civil Code sections. Plaintiffs respond that that their "claims are largely based upon [ ] code sections [1940–1954.1]," though they cite to paragraphs in their complaint relating only to their claims for

negligence, premises liability, and breach of the implied warranty of habitability. (Dkt. 89 at 16). Although their claim for breach of the implied warranty of habitability may indeed be implicated by section 1941.1, their claims for negligence and premises liability do not appear to arise under these Code sections. *See Blackburn v. Walmart, Inc.*, No. EDCV182487DOCSPX, 2019 WL 4570030, at *3 (C.D. Cal. Aug. 23, 2019), *aff'd*, 817 F. App'x 501 (9th Cir. 2020) (citing Cal. Civ. Code § 1714(a)). Thus, it remains only to be considered for purposes of this section whether the choice-of-law provision permits a state law claim for breach of the implied warranty of habitability, despite the fact that this provision is seemingly at odds with the federal enclave doctrine.

In the context of federal enclaves, this presents a matter of first impression, and the parties haven't cited any case law that guides or even implicates this issue. Nevertheless, the Court finds that the claim for breach of the implied warranty of habitability fails here for the same reasons as explained previously, *supra* Section III.A. Defendants have demonstrated, and Plaintiffs don't argue otherwise, that this claim was not recognized in California until after the creation of the federal enclave. Neither party has suggested that Congress expressed any intent to cede authority to California with respect to this claim, and permitting the parties to contract around federal law would lead to uncertainty and inconsistency in application of the law. In other words, because Congress has previously decreed which law applies on federal enclaves, the parties have no right to ignore that decree and apply in its place the law of their choosing. *Mersnick*, 2006 WL 3734396, at *6 ("[T]he rationale underlying the exceptions to exclusive federal jurisdiction over federal enclaves does not support the proposition that a contract between the federal government and a private party may alter the exclusivity of federal jurisdiction. Indeed, such a proposition appears to be inconsistent with the underlying policies."). Applying the federal enclave doctrine, the Court finds that Plaintiffs' claim for breach of the implied warranty of habitability is barred.

### D. Derivative Sovereign Immunity

Defendants attempt to resurrect their argument in favor of *Yearsley*-based derivative sovereign immunity, arguing that, given their status as contractors performing at the direction and authorization of the government, they are shielded from liability here. (Dkt. 79-1 at 18). Specifically, Defendants again suggest they were simply acting at the government's direction in carrying out management functions over the Property, referring to Congress's delegation of authority to private entities under the MHPI to manage and oversee military housing. (Dkt. 79-1 at 21). They state that they acted promptly and appropriately in responding to complaints and conducting investigations for suspected water intrusion on the Property. (*Id.* at 22). They also argue their actions "were precisely what they were instructed to do" under the terms of contracts and plans developed with and approved by the Navy, including a Maintenance Plan and Mold Management Plan, and their actions were well within the scope of their authority in managing the Property. (*Id.* at 21–22). Plaintiffs disagree with Defendants' characterization of their conduct, arguing that as part of their managerial responsibilities, "Defendants exercise[d] great discretion" in responding to and investigating complaints of moisture and mold, and that Defendants, not the Navy, undertook "day-to-day management, ma[d]e business decisions, and exercise[d] authority to make landlord decisions." (Dkt. 89 at 20). Defendants' argument fails for substantially the same reasons the Court cited when they first made it.

As the Court's prior Order on Defendants' motion to dismiss explained, *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18 (1940), involved a case in which a federal contractor was tasked with carrying out the terms of a federal directive to improve navigation on the Missouri River. The Supreme Court held that the contractor couldn't be held liable because the work "was all authorized and directed by the Government of the United States." *Id.* at 20–21. The opinion noted, however, that agents of the government could be held liable where the "ground of

liability [was] either that he exceeded his authority or that it was not validly conferred." *Id.* (collecting cases). In other words, contractors can be liable to the extent they fail to act according to government specifications.

The Ninth Circuit has held that this derivative immunity is limited to cases where the contractor had no discretion and was following government specifications completely. *Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 732 (9th Cir. 2015) (citing *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1001 (9th Cir. 2008)). In other words, a contractor is derivatively immune only to the extent it is correctly carrying out its validly-conferred authority and is following government specifications. *Yearsley*, 309 U.S. at 20–21; *Cabalce*, 797 F.3d at 732. Where the contractor exercises discretion, however, it is not immune. *Id.* (because defendants designed a plan "without government control or supervision," they were not entitled to derivative immunity).

Defendants point to the Supreme Court's holding in *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016), which they believe expanded immunity to any government contractor acting within its validly-conferred contractual authority. While certiorari was granted in that case to address an issue of mootness, the Court reiterated *Yearsley*'s holding that a contractor "who simply performed as the Government directed" was entitled to derivative immunity. *Id.* at 160, 167. But because the contractor unquestionably disobeyed government instructions, it was clear derivative immunity was unavailable. *Id.* at 168.

The parties don't dispute here that Defendants were acting according to validly-conferred authority from the Government. Instead, Defendants ask the Court to rely on out-of-circuit precedent to find that government contractors are shielded from liability where their work has been authorized and directed by Congress. (Dkt. 79-1 at 20). But as this Court ruled before, and consistent with Ninth Circuit precedent, "derivative immunity is available only when contractors are carrying out government instructions, without exercising any discretion of their

own—that is, where their actions are not merely permitted but directed by the government. To the extent claims arise from their own discretionary activity, they are not immune." (Dkt. 45 at 5).

Defendants don't deny that they exercised some discretion in performing their duties, but contend that none of their actions "went against the Navy's directives or [were] contrary to the contracts or Plans." (Dkt. 79-1 at 22). Although Defendants' management of the property was authorized through the MHPI and carried out with some guidance from the Navy, their actions in responding to Plaintiffs' complaints of moisture and mold were clearly not directed by the government and involved their own exercise of discretion.  For this reason, Defendants may not avail themselves of derivative sovereign immunity.

### E. Statute of Limitations on Valerie Clover's Personal Injury Claims

Defendants finally argue that Plaintiff Valerie Clover's personal injury claims are time-barred by either the statute of limitations for personal injuries caused by the wrongful act or neglect of another codified in Code of Civil Procedure section 335.1, or the statute of limitations for injuries based on alleged exposure to hazardous materials or toxic substances found in Code of Civil Procedure section 340.8. (Dkt. 79-1 at 23).  They contend that the statute of limitations started running in at least November 2015, the date she admitted to having come to suspect the Property was "making her family sick." (*Id*. at 24).  Defendants maintain that "[t]his is after she claimed she commenced having symptoms she attributes to alleged mold at the Property in this case including anger, sinusitis/headaches, and a miscarriage." (*Id*. at 25). Because Plaintiff didn't file her initial complaint in state court until November 2019, four years later, Defendants maintain the Court should grant summary judgment on those claims because they are barred by the applicable statute of limitations.

In opposition, Plaintiff argue that the "accrual date of a cause of action is delayed until the plaintiff is aware of their injury and its negligent cause." (Dkt. 89

at 20 (citing *Hopkins v. Dow Corning Corp.,* 33 F.3d 1116 (9th Cir. 1994) (emphasis in original)). She maintains that she and her family were unaware of the cause of their injuries until 2019, despite their diligence in seeking medical help and submitting complaints throughout their tenancy related to suspected mold and water intrusion issues. (Dkt. 89 at 21). She maintains "it was not until the Plaintiffs paid out of pocket for testing in April 2019 that air quality and swab sampling confirmed the presence of toxic mold at the property." (*Id.*). Prior to then, "the Clover family had suspicions that their years of illness may have had to do with the *home in general*, but had no reasonable basis for connecting their illness to *mold* until confirmed by medical and environmental testing experts." (*Id.* (emphasis in original)).

California has a two-year statute of limitations for personal injury claims. Cal. Code Civ. P. § 335.1 (requiring that "[a]n action for . . . injury to, or for the death of, an individual caused by the wrongful act or neglect of another" must be brought within two years). However, under California's statutorily-codified delayed discovery rule for toxic exposure cases, "any civil action for injury or illness based upon exposure to a hazardous material or toxic substance" must be brought within either two years from the date of the injury or two years after the plaintiff becomes, or reasonably should have become, aware of "(1) an injury, (2) the physical cause of the injury, and (3) sufficient facts to put a reasonable person on inquiry notice that the injury was caused or contributed to by the wrongful act of another, whichever occurs later." Cal. Code Civ. P. § 340.8(b); *see also Lopez v. Sony Elecs., Inc.*, 5 Cal. 5th 627, 633 (2018) (noting that "[t]he Legislature declared that section 340.8 was intended to codify the delayed discovery rule for personal injury and wrongful death cases involving toxic exposure").

While it is uncontested that Plaintiffs began to exhibit symptoms of illness well before they filed their complaint, there is no indication Valerie Clover was aware of the cause of her injury before 2019. *See Grano v. Sodexo Mgmt., Inc.*,

No. 3:18-CV-1818-RSH-BLM, 2023 WL 125590, at *31 (S.D. Cal. Jan. 6, 2023) ("While Plaintiffs may have learned at the hospital that they were infected with STEC, there is no evidence in the record demonstrating that Plaintiffs knew the cause of their STEC or were aware of sufficient facts that the STEC was caused or contributed to by the wrongful act of another."). Nor is there any evidence that the Clover family failed to exercise due diligence in discovering the true cause of their injuries. To the contrary, Plaintiffs attach records demonstrating that they sought medical help for the symptoms they were experiencing, and that it wasn't until 2019 when they paid out-of-pocket for testing that they discovered the presence of toxic mold in their home. (Dkt. 89 at 21; Dkt. 89-2, Exs. 1–3). That Plaintiff may have suspected that the wrongdoing was somehow attributable to their home is not enough to trigger the statute of limitations here. *See Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 813 (2005) ("[I]f a plaintiff's reasonable and diligent investigation discloses only one kind of wrongdoing when the injury was actually caused by tortious conduct of a wholly different sort, the discovery rule postpones accrual of the statute of limitations on the newly discovered claim."). Summary judgment as to Valerie Clover's personal injury claims is therefore **DENIED**.

### IV. CONCLUSION

Defendants' motion for summary judgment as to Plaintiffs' claims for negligent infliction of emotional distress, breach of the implied warranty of habitability, rent abatement, and premises liability is **GRANTED**. The Court **DENIES** summary judgment on Defendants' arguments as to the remainder of Plaintiffs' claims.

**IT IS SO ORDERED**.

Dated: March 4, 2023

*Larry A. Burns*

Hon. Larry Alan Burns
United States District Judge